# United States Court of Appeals
## For the First Circuit

No. 01-1780

UNITED STATES OF AMERICA,

Appellee,

v.

ALFRED SHARPTON,

Defendant, Appellant.

No. 01-1781

UNITED STATES OF AMERICA,

Appellee,

v.

ADOLFO CARRIÓN,

Defendant, Appellant.

No. 01-1782

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERTO RAMÍREZ,

Defendant, Appellant.

No. 01-1783

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ RIVERA,

Defendant, Appellant.

––––––––––––––

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

––––––––––––––

Before

Selya, Boudin, and Lynch,
Circuit Judges.

––––––––––––––

Flora Edwards, Max D. Stern, and Charles J. Ogletree, Jr., with whom Stern, Shapiro, Weissberg & Garin was on brief, for appellants.
Peter Strasser, Special Assistant United States Attorney, for appellee.

––––––––––––––

June 14, 2001

––––––––––––––

**Per Curiam.** Alfred Sharpton, Adolfo Carrión, Roberto Ramírez, and José Rivera appeal their convictions and sentences for violating 18 U.S.C. § 1382 by trespassing on Camp García Naval Installation at Vieques, Puerto Rico.[1] Sharpton was sentenced to 90 days' imprisonment in light of a prior conviction. The other defendants were sentenced to 40 days' imprisonment. We previously expedited consideration of these appeals. We now affirm.

Appellants advance a series of arguments. They argue that: the evidence was insufficient to sustain their convictions; their sentences were plainly unreasonable; they were rushed to trial and the trial court abused its discretion in denying a continuance; the sentencing proceeding was flawed; they were denied counsel of their choice; and their retained counsel was ineffective.

We set the context. An area of Camp García in Vieques is used for live-fire artillery and bombardment exercises by the U.S. Navy. This, in turn, has led to protests and political controversy. Some of the protesters have staged demonstrations within the perimeters of Camp García without obtaining permission to enter. These incidents have led to government prosecutions for

---

[1]     18 U.S.C. § 1382 provides in relevant part: "Whoever, within the jurisdiction of the United States, goes upon any military [or] naval . . . installation, for any purpose prohibited by law or lawful regulation . . . [s]hall be fined under this title or imprisoned not more than six months, or both."

trespassing on a military installation, a Class B misdemeanor charge carrying a maximum potential sentence of six months' imprisonment. In the year 2000, approximately 400 protesters were arrested and prosecuted for such trespasses.

Between April 27 and May 2 of 2001, over 180 arrests were made, including the arrests on May 1 of the four appellants here; during this time period, Camp García was totally closed because the live ordinance impact area was "hot" and demonstrations were going on at the gate. The district court has attempted to expedite the handling of these 180-plus cases, trying ten or so defendants a day in consolidated proceedings. The four defendants in these appeals were arraigned on May 2, 2001, and tried on May 23, 2001, along with eight others who had been arrested contemporaneously.

We address the appellants' substantive claims first and their procedural claims second.

**I.**

Sufficiency of the Evidence

Appellants argue that there was insufficient evidence that they had actual notice that they were trespassing on U.S. Navy property. See United States v. Bonilla, 648 F.2d 1373, 1377-78 (1st Cir. 1981) (holding that, where 18 U.S.C. § 1382 prosecution proceeds on trespass theory, it must be shown that defendant had

-4-

notice that entry onto military property was in fact prohibited).[2]

We have described the standard of review for insufficiency of the

evidence claims as "formidable." United States v. Loder, 23 F.3d

586, 589 (1st Cir. 1994). "[W]e must affirm unless the evidence,

viewed in the light most favorable to the government, could not

have persuaded any trier of fact of the defendant's guilt beyond

a reasonable doubt." United States v. Hernandez, 218 F.3d 58, 64

(1st Cir. 2000) (quoting United States v. Paradis, 802 F.2d 553,

559 (1st Cir. 1986)), cert. denied, ___ U.S. ____, 121 S. Ct. 840

(2001).

The appellants attempt a comparison of their case to

Bonilla. The defendants in Bonilla were arrested after approaching

Camp García by boat, landing on Blue Beach -- a beach on the south

side of the island lacking any fences or signs warning that entry

onto the area was prohibited. 648 F.2d at 1379-80 & n.14. Without

such means of notice, the Bonilla court held, the defendants could

---

[2]    The government contends that Bonilla has been abrogated by regulations at 32 C.F.R. §§ 770.35-.40, which state that the U.S. naval installations in Puerto Rico are "closed" military bases and that anyone who enters them without the advance consent of a commanding officer shall be considered in violation of § 1382. The publication of these regulations in the Federal Register, the government contends, provides constructive notice that entrance to Camp García is restricted. Appellants argue that the regulations cannot permissibly be construed to eliminate the actual notice requirement articulated in Bonilla. Because we find that, in any event, there was sufficient evidence that the appellants had actual notice that they were trespassing, we need not decide the question.

not be presumed to have known that they were trespassing on military property. Id. at 1383. The appellants here claim on appeal that they could have entered the base in the same fashion as the Bonilla defendants; the evidence was insufficient, they say, to prove that they did not, and so it was insufficient to prove that they had actual notice they were trespassing.

The comparison is simply not apt. The circumstances surrounding the appellants' arrests differ dramatically from those in Bonilla. In this case, one of the government's witnesses at trial, Officer Guebert, testified that she came upon the appellants on the north side of the island, standing near the fence running along the western border of the base.[3] The area was about half a mile from the main gate and miles from the beach. Questioned on cross-examination whether she asked the appellants if they had a permit to be there, Guebert responded that it was obvious that they had none and had entered illicitly: right behind them was the fence with a large hole cut through it.[4] That fact by itself is

---

[3] As to appellants' claim on appeal that they nonetheless "could have" landed on the south side, as in Bonilla, and walked to the north side where they were arrested, Officer Guebert specifically testified that such a scenario was highly unlikely. The appellants would have had to walk for several miles to the point of arrest and, in her opinion, surely would have been spotted by guards en route.

[4] That fence, an earlier witness had testified, is a steel fence topped with razor wire and has signs affixed to it stating "No Trespassing" in English and Spanish. Appellants stress the fact that the government presented no witness who directly observed the

sufficient to enable a rational factfinder to conclude beyond a reasonable doubt that the appellants knowingly trespassed onto Camp García.[5]

Sentences

The appellants next challenge the length of their prison terms. The sentences imposed were within the statutory limits. See 18 U.S.C. § 1382. Section 1382 is a Class B misdemeanor because a violation carries a maximum term of six months'

---

appellants coming through the hole in the border fence. Obviously, that fact can be proven through circumstantial evidence. Further, base records showed that none of the appellants had been given permission to enter Camp García.

[5]   This holding finds confirmation in the appellants' own allocutions at sentencing. Three of the four specifically noted that they traveled to Vieques fully aware that the protests they planned were likely to involve illegal conduct carrying the risk of imprisonment.

Adolfo Carrión stated, "I thought that it was absolutely important and patriotic . . . to do something that, in fact, we understand was a violation of a rule. . . . [W]e went into a territory understanding that we were engaging in an act of civil disobedience. . . . I am not trying to get around any meting out of justice. I certainly would be willing to serve whatever sentence you dispense."

Roberto Ramírez stated, "I came to Vieques knowing that there was a great likelihood that I am committing an act of disobedience, being an attorney, that I would have, someday, to come before a judge such as yourself. . . . Your Honor, I am prepared and ready to accept the responsibility for the acts that I have undertaken."

Alfred Sharpton said he understood that he risked imprisonment and the possible disruption of his important personal plans: "I risked all of that because I thought it was important to make a moral stand. . . . [W]hatever the Court's decision, I will stand by that decision and will have to deal with that decision."

imprisonment.  See id. § 3559(a)(7).  The sentencing guidelines do not apply to Class B misdemeanors.  See U.S.S.G. § 1B1.9.  We review the appellants' sentences, therefore, only to determine whether they are "plainly unreasonable."  18 U.S.C. § 3742(e)(4).

That extremely high bar is not met here.  The district court had valid reasons for imposing the sentences it did.  On this point, we take judicial notice of the district court's remarks during sentencing proceedings in another consolidated Camp García trespassing case, held the previous day.  There, the court explained that the primary factors motivating its sentencing decisions in these cases were those listed in 18 U.S.C. § 3553(a)(2)(A) and (B) -- namely, the need "to promote respect for the law" and the need "to afford adequate deterrence to criminal conduct."  The court, referring to sentences given in the year 2000, noted that treating Camp García trespassers with a "slap on the wrist" had not adequately served these objectives.  It can safely be thought that these same considerations generally guided the district court's sentencing decisions in the present case.  Indeed, the court imposed the same sentences in both proceedings: 40-day jail terms for first-time offenders and 90-day jail terms for second-time offenders.

We reject the appellants' contention that the district court's employment of these categories was in and of itself "plainly unreasonable," reflecting a "one-size-fits-all" approach to sentencing that ignored material differences between defendants. The record makes clear that the court drew individual distinctions among the various defendants. Not only did the court distinguish between first- and second-time offenders, but the court also took into account more individualized factors that it considered to be mitigating; specifically, the court gave lighter sentences to those defendants with serious medical conditions.

Perhaps, as the appellants contend, the district court could have drawn more subtle distinctions among the defendants and adjusted the precise length of their individual sentences accordingly. But there is nothing "plainly unreasonable" about the district court's choice to limit its drawing of distinctions at the point that it did -- especially given that there was nothing in the record to distinguish the offense conduct of the individual defendants; all appeared to have trespassed in the same fashion in the same incident.[6]

---

[6] Thus, the appellants' objection to a categorical policy of imposing the same sentence on peaceful and seriously disruptive trespassers alike is academic. Here, the court did not vary the defendants' sentences according to differences in their offense conduct simply because there do not appear to have been any such differences. The court in no way implied that it was adopting a policy that would ignore such differences in cases where they actually existed.

In short, these matters firmly rest within the broad discretion of the district court.  We find nothing "plainly unreasonable" in the manner in which the court exercised that discretion.   The appellants' sentences stand.

---

Relatedly, appellants speculate that the district court might have sentenced them as it did because it believed that they were the particular defendants who cut through the fence.  There is not one iota of record support for this contention; to the contrary, the contention is belied by the uniformity of the sentences imposed as between the appellants and the other defendants.

Denial of Continuance

Appellants argue that they lacked sufficient time to prepare for trial and that the district court abused its discretion in denying their motion for a continuance.

The record shows that the court issued a notice on May 10, 2001, alerting the parties to the trial date, May 23, 2001. Counsel did not move for a continuance until the commencement of trial. In denying a continuance, the trial court referenced the fact that the May 10 notice of the trial date provided adequate time for preparation and on that basis ordered the trial to proceed.

That decision withstands scrutiny. The trial transcript reveals that Jorge Manuel Carmona Rodriguez was appellants' counsel of record from the date of arraignment. In requesting a continuance at trial, Carmona's only stated reason for not being prepared was that his clients had just arrived that morning. Once counsel had notice of the trial date, it was his obligation to prepare his clients for trial. That he did not do so until the morning of the proceeding (assuming the allegation is true) does not oblige the district court to grant a motion for a continuance.[7]

_____

[7]     It is also noteworthy that none of the other defendants tried along with the appellants moved for a continuance on the ground that their counsel had not had adequate time to meet with them in

-11-

Counsel did not argue to the trial court that the notice of the trial date was deficient in any way; nor did he provide any other reason for a continuance.

To be sure, exactly when counsel received the notice of the trial date is unclear from the record.  The docket indicates that the order setting the trial date was signed on May 10.  It is possible that it was mailed later, and the defendants now assert that their counsel did not receive it until May 18.  Even assuming, however, that counsel was not notified of the trial date until May 18 and did not receive discovery until May 22, the appellants must still show they were prejudiced by a May 18 notice.  See United States v. Brand, 80 F.3d 560, 564 (1st Cir. 1996).

From this record, the appellants have shown no cognizable prejudice.  Appellants were arrested on May 1 and arraigned on May 2.  They had three weeks to prepare for trial.  The case was simple and straightforward; the evidence and witnesses were readily available to appellants' counsel.  Appellants fail to explain specifically how, under these circumstances, counsel was

---

preparation for trial.

Further, under the Speedy Trial Act, a defendant charged with a Class B misdemeanor may be brought to trial in less than 30 days from arrest.  See 18 U.S.C. § 3161(c)(2) (requiring minimum 30-day waiting period before trial); id. § 3172(2) (exempting Class B misdemeanors from scope of Act).  These defendants were represented by counsel from May 2 on and, under the law, the setting of a prompt trial should not have come as a surprise.

nonetheless prevented from developing their case. They merely offer generalities -- a need to assess the discovery, marshal witnesses, develop a theory of the case, and so on.

At most, appellants suggest that, had they had enough time, they would have been able to review and put into evidence a videotape of their arrests taken by a videographer hired to accompany them on the protest. Appellants argue that the tape was probative both as to guilt on the issue of notice and as to sentencing. Again, though, appellants offer no specific description of the tape's contents that might illustrate how it would have been exculpatory or mitigating. Moreover, the tape was made on the day of the arrests -- May 1 -- roughly three weeks before trial. It is thus not apparent why Carmona could not have reviewed the tape ahead of time or why he was unable to proffer it at trial.

Sentencing Proceedings

The appellants also complain that the court sentenced them without a presentence report (PSR) and without giving them any meaningful opportunity to present mitigating evidence. They contend that the court denied what they characterize as trial counsel's motion to join previous defense motions -- made in a separate case the preceding day -- for presentence reports and for additional time to prepare for sentencing.

However, the record reveals that counsel never made such a motion. At the conclusion of the presentation of evidence, counsel said simply that he wished to "join the defense's motions that have been filed." Context makes it perfectly clear that the motions referred to were not sentencing motions made in a separate case the preceding day. They were Rule 29 motions for a judgment of acquittal, which other defense counsel had just made. Hence, because the appellants failed to make a timely objection to the sentencing proceedings, we review those proceedings for plain error, and find none.

As to whether the court permissibly proceeded to sentencing without the preparation of a PSR, Rule 32(b)(1) states that a PSR must be prepared unless "(A) the court finds that the information in the record enables it to exercise its sentencing authority meaningfully under 18 U.S.C. § 3553; and (B) the court explains this finding on the record." Fed. R. Crim. P. 32(b)(1). Although the district court did not explicitly make such a finding in this case (understandably, given that appellants never made a motion under Rule 32(b)(1)), the court did explain in proceedings the previous day why it believed that PSRs were generally not needed in Camp García trespassing cases such as this one. The court explained that the primary factors motivating its sentencing decisions in these cases were those listed in 18 U.S.C. §

-14-

3553(a)(2)(A) and (B) -- the need to promote respect for the law and to adequately deter criminal conduct. Moreover, the court stressed that the crimes at issue were misdemeanors carrying a maximum sentence of six months -- so that room for sentencing adjustments was sharply constricted in comparison with felony cases. Thus, the court concluded that allocution by the defendants and representations by counsel would be sufficient in these trespassing cases and that requiring the preparation of PSRs would impose an unnecessary burden on the probation department.

The court's decision was not plainly erroneous. Moreover, even were we to assume arguendo that the district court failed to comply with Rule 32(b)(1), the appellants have not shown how they have been harmed by the lack of a PSR. See United States v. Lowe, 654 F.2d 562, 566 (9th Cir. 1981) (concluding that sentencing properly proceeded in the absence of a PSR, given that there was no evidence that the court relied on erroneous information and defendant did not credibly suggest how a PSR would have changed the sentence imposed). Each appellant was given and took the opportunity for allocution at sentencing, in which they brought various potentially mitigating facts to the court's attention. Counsel likewise made such representations to the court. Appellants have not shown how the preparation of PSRs would have allowed them to put forward any mitigating facts that were not

-15-

raised, or could not reasonably have been raised, during the sentencing proceeding.

Appellants similarly reiterate their claim that they lacked adequate time to prepare for the case, and so lacked adequate time to prepare for their allocutions. They claim to have been taken completely by surprise by the court's sentencing decision. This claim is unpersuasive.

First, at their May 2 arraignment, appellants were forewarned that the offense with which they were being charged carried with it the prospect of a prison term. Appellants thus cannot claim surprise that terms of imprisonment were imposed in their cases.[8]

---

[8] For this reason, this case is a long step removed from Burns v. United States, 501 U.S. 129 (1991), on which appellants rely in arguing that the district court was obliged to notify them of its intention to sentence first-time offenders to 40 days and second-time offenders to 90 days. In Burns, the Supreme Court held that a district court must notify a defendant in advance if the court is contemplating a sua sponte upward departure from the applicable guidelines range. 501 U.S. at 138-39. Here, of course, the district court did not depart upward from the relevant sentencing range (which, in this case, was the statutory range, since the appellants' offense was a Class B misdemeanor to which the sentencing guidelines do not apply). The district court imposed sentences well within this range; appellants merely allege that the sentences were at odds with the court's past practice from the previous year. Burns does not extend to such a situation. Cf. United States v. Adipietro, 983 F.2d 1468, 1473-74 (8th Cir. 1993) (holding that, because "[d]epartures are sharply circumscribed under the sentencing guidelines and represent a more drastic change in a defendant's sentence than merely adjusting a sentence without going outside the presumptive sentencing range," Burns applies only to departures from, and not to adjustments within, guidelines range); accord United States v. Canada, 960 F.2d 263, 267

-16-

Second, as to whether the appellants had a sufficient opportunity for allocution, we again find no error, plain or otherwise, in the proceedings conducted by the district court. Appellants each gave lengthy allocutions in which they described various facts that they thought should mitigate their sentences -- e.g., that their offenses were motivated by reasons of conscience, that they held positions of political responsibility and were participating in pending election campaigns, and that they had important personal plans for the near future. They made no request to provide further information before the court passed sentence.

On appeal, appellants articulate no other potentially mitigating facts that they would have included in their allocutions had they had more time to prepare. The only significant suggestion made is that one of the appellants, Rivera, did not have the fair opportunity to inform the court that he suffered from a medical condition, specifically, hypertension. But that suggestion is untenable. Much of the sentencing proceedings focused on the issue of medical conditions. The court had, before hearing from the appellants, heard extensively from other defendants as to their medical conditions; and before passing sentence on any of the defendants, the court made clear that those defendants with medical conditions would receive lighter sentences. Appellant Rivera heard

_____

(1st Cir. 1992) (<u>Burns</u> does not apply to mere upward adjustments).

-17-

and observed these aspects of the proceedings, yet chose to remain silent as to his own medical condition.  He was not denied the fair opportunity to raise the issue.

Assistance of Counsel

The appellants argue that they were denied the right to retain counsel of their own choosing.  But attorney Carmona, in fact, <u>was</u> retained counsel and had appeared for the appellants at their May 2 arraignment.  No motion by Carmona to withdraw as counsel was made at any time from May 2 until after the commencement of the trial.  It was only after appellants' motion for a continuance was denied that they asked Carmona to move to withdraw.  Carmona did so, and the motion was denied.  The trial court reasonably could have thought that the stated desire to obtain substitute counsel -- notably, first raised in the immediate aftermath of the denial of a continuance and not until after trial had commenced -- was merely another attempt to obtain a delay of the trial, a request already denied.

More importantly, defendants were not denied their choice of counsel.  Carmona informed the court that appellant Sharpton wanted another attorney.  None of the other three defendants made such a request.  The court responded that it would allow Sharpton to have additional representation, but the case was going forward in any event.  Attorney Sanford Rubenstein was present in the

courtroom, accompanying Sharpton. It is unclear from the record whether Rubenstein, who says he is a civil lawyer, was the lawyer Sharpton wanted. If Rubenstein were wanted, Sharpton could easily have had Rubenstein join in his defense. Sharpton's discourse at sentencing suggests that he did want representation by Rubenstein, in order to put into evidence his own videotape of the appellants' arrests. Again, there is no explanation by Sharpton as to why Carmona could not have sought the admission of the videotape.

Finally, the appellants contend that they suffered from ineffective assistance of counsel, in that their trial counsel chose not to put on a defense or cross-examine government witnesses. They request a new trial. The rule is firm, however, that an ineffective assistance claim will not be entertained on direct appeal "absent a sufficiently developed evidentiary record." United States v. Ademaj, 170 F.3d 58, 64 (1st Cir.), cert. denied, 528 U.S. 887 (1999). Appellants insist that the relevant facts are established and the matter should be resolved now. But, as evidenced from the discussion above, a number of relevant facts are far from established. For example, it is unclear when appellants' counsel received notice of trial, or what preparations counsel took in anticipation of trial.[9] Thus, if an ineffective assistance

---

[9] On the facts as they stand, it is quite plausible that appellants' trial counsel's failure to put on a defense or cross-examine government witnesses stemmed not from ineffectiveness, but from

-19-

claim is to be brought at all in this case, it must be brought under 28 U.S.C. § 2255.

## III.

The judgment of the district court is <u>affirmed</u>.

---

a strategic choice by the appellants to take "the high road," as Rivera called it during his allocution, and accept whatever came of their acts of conscience. Certainly, some of appellants' own remarks during sentencing suggest such a strategy. <u>See</u> <u>supra</u> note 5.