# United States Court of Appeals
## For the First Circuit

No. 01-2149

UNTIED STATES OF AMERICA,
Appellee,

v.

ZORAIDA FIGUEROA-ARENAS,
Defendant.

ADALINA DE JESUS-MORALES,
Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Selya and Lipez,

Circuit Judges.

Judith Berkan, with whom Berkan/Mendez was on brief, for appellant.
Stella J. Song, Special Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Chief, Criminal Division, and Frank J. Bustamonte, Special Assistant United States Attorney, were on brief, for appellee.

May 6, 2002

**SELYA**, <u>Circuit Judge</u>. The efforts of a number of persons to halt the Navy's use of the island of Vieques for bombing and other live-fire exercises sometimes have gone beyond what the law permits. These excesses, and the federal courts' necessary involvement in bringing lawbreakers to account, have spawned considerable public controversy. This appeal stems from an incident related to that controversy. In it, the appellant, attorney Adalina De Jesús-Morales, asks us to annul sanctions imposed against her by the district court in the course of a Vieques protest case. As the recent history of appeals indicates, the district court has done an admirable job in handling a sudden influx of several hundred protesters' cases under the microscope of pervasive media attention; but in this unusual instance, taking direct account of the need to assure robust advocacy in criminal matters, we find no legally sufficient basis for the imposition of sanctions (and, therefore, vacate the challenged order).

The background facts are not disputed. The Navy has used Vieques for live-fire exercises for upward of sixty years. Its activities have become increasingly unpopular over that span (at least among some groups) and protests have erupted from time to time. <u>E.g.</u>, <u>United States</u> v. <u>Parrilla Bonilla</u>, 648 F.2d 1373, 1374 (1st Cir. 1981). A fatal accident (involving an employee of the Navy) occurred in 1999. This accident drove the dissonance to a new pitch. As a result, the federal district court has been

deluged with criminal trespass cases brought against protesters who were arrested after they entered either the naval base situated on the island of Vieques or the areas associated therewith.  See, e.g., United States v. Ventura-Meléndez, 275 F.3d 9, 16-18 (1st Cir. 2001); United States v. Maxwell, 254 F.3d 21, 23-24 (1st Cir. 2001); United States v. Sharpton, 252 F.3d 536, 538-39 (1st Cir. 2001) (per curiam).  This massive infusion of cases has thronged the already congested docket of a busy court.

After the initial batch of arrests — 465 in all — the chief judge of the district court acted quickly to marshal available judicial resources.  Although the court's standard praxis called for the random assignment of criminal cases,[1] the chief judge entered an order dated June 28, 2000 (the Presentment Order), which directed that all Vieques cases be brought to the chief judge upon filing for assignment by him to available district and magistrate judges in a rotating sequence (the mechanics of which were not specified).  The Presentment Order bore only the chief judge's signature.

In April of 2001, another wave of protests occurred and an additional 181 criminal trespass cases were filed.  The chief judge granted the government's ex parte motion to consolidate and

---

[1]In terms, the operative local rule, D.P.R. R. 302.4, speaks only of civil cases.  The parties agree, however, that the district court traditionally has applied this rule to criminal cases as well.

the cases were segregated into clusters (by arresting officer). The consolidations left some of the judges with multiple groups of defendants and others with few or none. To alleviate this unequal distribution, the senior active judge, temporarily at the court's helm in the chief judge's absence, ordered groups of cases reassigned to equalize the judges' workloads.

Although these arrangements proved more efficient in certain respects, they created a number of anomalies. Some defendants found themselves lumped with other defendants who had been arrested at different times and/or places. When certain defendants complained that they had not received prior notice of the government's motion to consolidate, and that, at any rate, the consolidation order violated the joinder provisions of Federal Rule of Criminal Procedure 8(b), the chief judge rejected their importunings. He did, however, issue an order explaining in some detail the rationale for the Presentment Order, the consolidation order, and the ensuing reassignment of groups of cases. See United States v. Ayala Ayala, No. 01-211 (D.P.R. June 5, 2001) (unpublished order). He also explained that the terms of the Presentment Order were no longer in vogue, but, rather, that Vieques cases were being assigned randomly by the clerk's office, and then reassigned by him only when necessary to ensure efficient handling. See id.

-4-

The appellant represented a codefendant (Zoraida Figueroa-Arenas) charged in the very case that yielded the June 5 order. She also represented a second defendant (Juan Nuñez-Reynes) who had been charged in another case arising out of the most recent spate of protests. Both groups of cases had been shifted to the chief judge's calendar by virtue of the consolidation order. On June 14, 2001, the appellant (acting on behalf of both clients) moved to dismiss the pending charges or, in the alternative, for reassignment.[2] Noting that the statute authorizing district courts to promulgate local rules, 28 U.S.C. § 137, requires that the chief judge respect these rules and assign the cases as provided therein, the motion papers asserted that an assignment system cannot deviate from that established by the court's local rules without the consent of the judicial council for the circuit in which the district sits. Because the Presentment Order did not explain the source of the chief judge's ostensible authority to contravene this statute, the motion argued that the ad hoc assignment system for Vieques cases was fatally flawed. The motion elaborated on this thesis, stating in part:

> According to the Local Rules of this Court regarding the assignment of cases, Rule 302.4 and Rule 302.8, civil and criminal case[s] must be assigned by lot. The chief judge in this case has usurped the authority of his

_____

[2]Although the motion did not elaborate on the prayer for alternative relief, the appellant presumably had in mind returning the cases to the judges who originally had drawn them.

-5-

fellow judges and taken control of the assignment system for criminal cases. . . .

. . . .

. . . . The recent order of June 5, 2001 suggests that, contrary to [the Presentment Order], Vieques trespass cases are being assigned randomly by the clerk's office and then referred to the Chief Judge for reassignment. Either way, the interference with the normal practice of the Court regarding case[] assignments [is] unlawful and must be voided as the Chief Judge does not have the authority to alter this practice within the district.

The next day, the appellant appeared before the chief judge for a scheduling conference in the Figueroa-Arenas matter. The conference was held in chambers, with a court reporter present. The chief judge expressed concern about the statements contained in the motion, characterizing those statements as an unfair attack on the court. Despite the appellant's disclaimer of any defamatory intent, the chief judge placed her under oath to inquire into the factual foundation for the statements. The appellant defended her handiwork as a good-faith interpretation of the Presentment Order, the district court's praxis, and the governing law. She admitted, however, that she had done no independent investigation into the facts (i.e., that she had not contacted the other judges in the district to ascertain whether they had consented to the new system).[3] The chief judge took no action at that moment.

---

[3]The district court's local rules permit reassignment of cases in certain circumstances, e.g., if both the transferor and

Four days later, the chief judge denied the pending motion. United States v. Figueroa-Arenas, 150 F. Supp. 2d 333, 335-36 (D.P.R. 2001). He simultaneously denounced the allegations contained in the motion as unfounded, declared that the appellant had failed to conduct a suitable investigation before making those allegations, and worried aloud that the allegations would lead "to the diminution of public confidence in the Court as an impartial arbiter of the law, especially when such false allegations find their way into the media." Id. at 338. Concluding that the appellant's actions constituted "misconduct" because she had made statements impugning the integrity of a judge in reckless disregard of the truth, the chief judge exercised the court's inherent power and ordered her to pay a $500 fine. Id.

On July 6, 2001, Figueroa-Arenas was convicted on the underlying charge. This timely appeal of the sanctions order ensued. In it, the appellant argues that she did not have adequate notice of the specific charges leveled against her; that the in-chambers colloquy at the status conference did not constitute a meaningful opportunity to be heard on the matter; and that, in all events, she did not commit any sanctionable misconduct.

We review the imposition of sanctions for abuse of discretion. McClane, Graf, Raulerson & Middleton, P.A. v.

_____

transferee judge assent to the reassignment. See D.P.R. R. 302.2, 302.7-302.9.

-7-

Rechberger, 280 F.3d 26, 42 (1st Cir. 2002); Jones v. Winnepesaukee Realty, 990 F.2d 1, 5 (1st Cir. 1993). It is common ground that if a trial judge is to manage a crowded calendar fairly and efficiently, members of the bar must comport themselves in a professional manner. When a lawyer goes too far — that is, when a lawyer's conduct is vexatious, oppressive, or undertaken in bad faith — the judge must be accorded considerable latitude in dealing with such excesses. Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995). Despite this imperative, however, a judge's power to sanction an attorney is not unbridled — and that power cannot be used to chill vigorous but legitimate advocacy. See Kale v. Combined Ins. Co., 861 F.2d 746, 760 (1st Cir. 1988); In re Bithoney, 486 F.2d 319, 322 (1st Cir. 1973). In short, sanctions are an integral part of the judicial armamentarium, but a judge should resort to them only when reasonably necessary — and then with due circumspection. See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). We think it follows that, in an appeal from the imposition of sanctions, substantial respect is owed to the trial court's first-hand appraisal, but that respect "is not to be confused with automatic acquiescence." United States v. One 1987 BMW 325, 985 F.2d 655, 657 (1st Cir. 1993).

In the ordinary case, the due process issues raised by the appellant (which implicate notice and the opportunity to be heard) might form a logical starting point for our analysis. Here,

-8-

however, we find the issue of whether the appellant committed any sanctionable misconduct to be dispositive. Accordingly, we begin — and end — with that issue.

Our decision in United States v. Cooper (In re Zalkind), 872 F.2d 1 (1st Cir. 1989), helps to set the stage. There, an attorney, reacting to comments made by the trial judge, filed a recusal motion. Id. at 2. The judge took umbrage at the allegations contained in the motion papers and eventually sanctioned the attorney for knowingly making false accusations. Id. On appeal, we noted that a lawyer has a right to file a recusal motion, even though it offends the judge or puts him in an unflattering light, "when facts arise which suggest the judge has exhibited bias or prejudice." Id. at 4. Finding that the record contained an adequate factual predicate, and did not show misrepresentation or bad faith on counsel's part, we vacated the sanctions order. Id. at 4-5.

Even though the case at hand does not involve a recusal motion, the principles that informed our decision in Cooper are fully applicable here. The pivotal question is whether the record furnishes adequate support for the chief judge's determination that the appellant acted recklessly or in bad faith when she filed the motion to dismiss or reassign. We think it does not.

On its face, the Presentment Order did not reflect that the chief judge was acting with the approval of either the circuit

-9-

council or the affected judges. These omissions raised a reasonable doubt about the chief judge's authority, acting alone, to exempt a particular class of cases from the random lottery and to reassign those cases in some other sequence. The appellant seized upon this doubt and wove a colorable argument from it. She pointed out, correctly, that under the district court's local rules and its standard praxis, assignment of cases ordinarily is by lot; and cases, once assigned, usually require the consent of both the transferor and transferee judges as a precondition to any administrative reassignment. The appellant also noted, again correctly, that the enabling statute, 28 U.S.C. § 137, requires the chief judge to enforce the local rules as written (at least in the absence of leave from the circuit council to chart a different course). Given this factual and legal predicate, the appellant's characterization of the reassignment of her clients' cases as irregular was within the bounds of legitimate advocacy. So too her related argument that reassignment pursuant to the Presentment Order and the consolidation order was ultra vires.

This conclusion is reinforced by the inclusion, in the motion papers, of citations to a plenitude of decided cases. E.g., United States v. Pearson, 203 F.3d 1243, 1255-67 (10th Cir. 2000); Cruz v. Abbate, 812 F.2d 571, 573 (9th Cir. 1987); Utah-Idaho Sugar Co. v. Ritter, 461 F.2d 1100, 1103-04 (10th Cir. 1972). These decisions gave the appellant's position a patina of plausibility.

In Utah-Idaho Sugar Company, for example, the chief judge of the district court took for himself some cases that previously had been assigned to a judge assuming senior status. 461 F.2d at 1102. An affected party petitioned for mandamus, and the Tenth Circuit granted the writ. The court wrote:

> [U]nder the terms of 28 U.S.C. § 137, it is unquestioned that the division of the court's business in a multi-judge district is the responsibility of the judges and not the responsibility of the chief judge acting unilaterally. The latter's duty is to insure that the agreed upon rules are enforced and are administered so as to carry out their purposes, but it is not his duty to promulgate rules without the approval of his fellow judges . . . .

Id. at 1103 (footnote omitted). The Tenth Circuit concluded that the chief judge could not unilaterally deviate from the district court's local rules "until such time as it clearly appears that he is acting with the full concurrence of the [appropriate authority]." Id.[4]

A lawyer should be allowed to argue that a case was wrongly assigned or transferred when circumstances give rise to a plausible assertion to that effect. Given the facts of record here, the absence of any factual misrepresentations, and the colorable legal argument advanced, we conclude that the appellant

---

[4]In 1972, when the Tenth Circuit decided Utah-Idaho Sugar Company, the judges of the district court, acting collectively, had the power to modify, rescind, or grant exceptions from the local rules. 461 F.2d at 1013. That power is now vested in the circuit council. See 28 U.S.C. § 332(d)(4).

-11-

did not act in objective bad faith in filing the motion. See Cooper, 872 F.2d at 4 (suggesting that an attorney has a duty to file a motion that may help his client as long as the factual proffer supporting the motion is tendered "in good faith and [contains] no factual misrepresentations"); In re Bithoney, 486 F.2d at 322 (recognizing the need to allow "breathing room for the fullest possible exercise of the advocacy function"). Although the court below was free to point out the flaws in the appellant's reasoning, distinguish the cases on which she relied, and ultimately deny the requested remedy, the motion nonetheless was an appropriate vehicle for advancing facially legitimate issues suggested by the record.

To the extent that the sanctions order can be read to accuse the appellant of acting in subjective bad faith, that accusation too lacks record support. Nothing in the wording of the motion or in the appellant's responses to the chief judge's questions indicates either that an improper motive inspired the filing or that she believed that what she had asserted was false. To cinch matters, the appellant came to this case with clean hands — insofar as we can tell from the record, she had no prior history of contumacious conduct — and the motion itself was couched in respectful (albeit fervent) language. While words such as "usurp" and "unlawful" might impugn a jurist's character in some contexts, the appellant appears to have used them only to argue that the

court had overstepped the limits of its authority.  In that sense, the motion was little more than a challenge to the chief judge's exercise of jurisdiction, and, as such, was appropriate.

The government has one last string to its bow.  It attempts to justify sanctions based on the chief judge's finding that the appellant failed to conduct a proper investigation into the provenance of the Presentment Order.  Assuming, for argument's sake, that the appellant had a duty to investigate the allegations set forth in the motion, cf. Fed. R. Civ. P. 11(b) (imposing such an obligation in the civil context),[5] we deem her investigation reasonable under the circumstances.  She verified the contents of the Presentment Order, determined that it remained unrevoked, factored in the effect of the supplementary order issued by the senior active judge in the chief judge's absence, and considered the chief judge's explanatory order of June 5, 2001.  To require more would be to place an undue burden on defense counsel in a criminal case.  See In re Order to Show Cause, 741 F. Supp. 1379, 1383 (N.D. Cal. 1990) (noting that, when preparing motions in a

---

[5]We express some skepticism because there is no counterpart to Rule 11(b) in the criminal context.  That is unlikely to be mere happenstance:  "because of the significant liberty deprivation often at stake in a criminal prosecution, courts generally tolerate arguments on behalf of criminal defendants that would likely be met with sanctions if advanced in a civil proceeding."  In re Becraft, 885 F.2d 547, 550 (9th Cir. 1989) (per curiam).  As the Seventh Circuit perspicaciously observed, "novel arguments that may keep people out of jail ought not to be discouraged by the threat of [fines]."  Wisconsin v. Glick, 782 F.2d 670, 673 (7th Cir. 1986).

criminal case, it is not defense counsel's responsibility "to perform the role of the court or the jury to decide ultimate truth"). We thus conclude that the appellant's conduct was within the permissible bounds of vigorous advocacy, and, therefore, that sanctions are unsustainable.

We have one final observation. The motion papers filed by the appellant do not accuse the chief judge of manipulation; they merely make the plausible (if ultimately unavailing) legal argument that he lacked the authority to take the steps that he took. To the contrary, the record is not only devoid of any suggestion that the chief judge used the assignment power for an invidious purpose, but, indeed, reveals that at all relevant times he was endeavoring to position the court to cope with an unanticipated deluge of cases that unexpectedly had strained the institutional resources of the district court.

We need go no further. Because the appellant was guilty of nothing more sinister than the zealous discharge of her duty to represent her clients with vigor, we <u>vacate</u> the sanctions order.

**<u>So Ordered</u>**.