772 F.2d 733
 UNITED STATES of America, Plaintiff-Appellee,
v.
Sister Anne MONTGOMERY, Per Ingmar Herngren, Patrick
O'Neill, Christin Marie Schmidt, Paul Joseph
Magno, Jr., James Lyman Perkins, Timothy
Allen Lietzke, Todd Simcha
Kaplan, Defendants-Appellants.
 No. 84-3520.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 27, 1985.
 
 James M. Russ, Orlando, Fla., Norman A. Townsend, Atlanta, Ga., for defendants-appellants.
 Thomas W. Turner, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before RONEY and FAY, Circuit Judges, and DUMBAULD*, District Judge.
 RONEY, Circuit Judge:
 
 
 1
 Early on the morning of Easter Sunday, 1984, eight members of the group "Pershing Plowshares," which is opposed to the production and spread of nuclear weapons, cut through a fence surrounding the Martin-Marietta Aerospace Corporation's defense plant in Orlando, Florida. Entering a building within the compound, they hammered and poured blood onto both nuclear and conventional missile launchers and components belonging to the United States Army, hung banners and distributed pictures and documents condemning nuclear weapons around the scene, and remained on the premises singing and praying until they were taken into custody. The incident caused an estimated $23,266 in actual damages.
 
 
 2
 Convicted of depredation of United States Army property in excess of $100, 18 U.S.C.A. Sec. 1361, and conspiracy, 18 U.S.C.A. Sec. 371, they contend on appeal that the trial judge inadequately questioned jurors at voir dire on pretrial publicity, improperly denied dismissal of two jurors for cause, and erred in excluding evidence to support affirmative defenses of necessity and international law. We affirm.
 
 
 3
 After indictment, defendants entered not guilty pleas and waived counsel, although they accepted the services of attorneys in an advisory capacity. Following a six-day trial and a jury verdict, the court sentenced each defendant to three years imprisonment on the first count and five years probation on the second count to be served consecutive to the term of imprisonment, and ordered each defendant to make restitution of $2,908, an amount constituting a one-eighth share of the actual damage to Army property.
 
 
 4
 Defendants first claim that during voir dire the trial judge failed to question the potential jurors sufficiently to ascertain the effect of pretrial publicity on their ability to render an impartial verdict based solely on the evidence. The trial court did not abuse the considerable discretion with which it is vested. Although defendants were not permitted to question the jurors individually, the trial judge questioned the jurors both collectively and individually, and invited the defendants to submit to the court specific questions. "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct voir dire." Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); see also United States v. Tegzes, 715 F.2d 505, 507 (11th Cir.1983); United States v. Brunty, 701 F.2d 1375, 1378-79 (11th Cir.), cert. denied, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983).
 
 
 5
 Where there has been substantial pretrial publicity concerning a criminal case, it is not required that the jurors be wholly ignorant of the facts and issues involved. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 723, 81 S.Ct. at 1643; see also United States v. Williams, 568 F.2d 464, 468-69 & 469 n. 11 (5th Cir.1978); Calley v. Callaway, 519 F.2d 184, 205-06 (5th Cir.1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).
 
 
 6
 When it became apparent that most members of the panel had previously heard of the case, the court asked each juror individually whether he or she would be able to set aside what he or she had read or heard and base a verdict solely on the evidence. The jurors who responded negatively were struck for cause, and every juror who served eventually answered that question affirmatively. Although the judge did not ask specifically what each juror had read or heard, United States v. Davis, 583 F.2d 190, 196-97 (5th Cir.1978), the voir dire was adequately thorough and searching to enable the court to determine whether the jurors were impartial and to permit the defendants to decide when to exercise their challenges, both for cause and peremptory. United States v. Bascaro, 742 F.2d 1335, 1350-51 (11th Cir.1984).
 
 
 7
 Defendants are not in a good position to complain of the effect of pretrial publicity that they actively sought and cultivated. The whole purpose of their actions was to generate publicity for their cause. One photograph showing the eight defendants at the scene of the crime and another showing a blood-spattered missile launcher panel were released to the newspaper by the defendants themselves. Prior to voir dire, the trial court took notice that some or all of the defendants had recently discussed the case on local radio and television programs. Defendants' convictions are not reversible because of pretrial publicity.
 
 
 8
 Defendants claim that jurors Young and Satterfield should have been excused for cause, and that they should not have been forced to exercise peremptory challenges to exclude them from the jury. Juror Satterfield admitted exposure to pretrial publicity, expressed that he was "disturbed" by the destruction of property, and initially indicated that he had formed an opinion that would prevent him from being impartial. After further questioning by the trial court, however, Juror Satterfield indicated his disapproval of the act would not prevent him from according defendants the presumption of innocence and basing a verdict solely on the evidence and the law. Defendants opposed Juror Young because of his employment with the Air Force, which they claim does substantial business with Martin-Marietta. He also informed the court that he would render a guilty verdict only if the Government could prove its case against the defendants. "The decision whether to excuse a juror for cause is entrusted to the discretion of the trial judge." United States v. Tegzes, 715 F.2d at 509; see United States v. Butera, 677 F.2d 1376, 1384 (11th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). Defendants have shown no abuse of discretion by the trial judge in denying their motions to exclude these jurors for cause.
 
 
 9
 Defendants' most interesting claim is that the trial judge erred in excluding evidence offered to establish the affirmative defenses of necessity and international law. In order to establish the justification defense of necessity, defendants must show, among other things, that they had no reasonable alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm. United States v. Bailey, 444 U.S. 394, 410, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980); United States v. Gant, 691 F.2d 1159, 1162-63 (5th Cir.1982). In order to have the defense submitted to a jury, a defendant must first produce or proffer evidence sufficient to prove the essential elements of the defense. See Bailey, 444 U.S. at 412 n. 9, 100 S.Ct. at 635 n. 9.
 
 
 10
 Defendants' proffer on lack of alternatives is insufficient. Although defendants sought to offer evidence that "the normal political processes have been rendered ineffective to meet the dangers created by nuclear arms build-up," it is clear that defendants had reasonable legal alternatives to the destruction of Government property, including peaceful protests and petitioning Congress or the President. Their purpose was to confront the political leaders with their message. People are not legally justified in committing crimes simply because their message goes unheeded. Defendants could not hold a reasonable belief that a direct consequence of their actions would be nuclear disarmament. See United States v. Dorrell, 758 F.2d 427, 433-34 (9th Cir.1985); United States v. Seward, 87 F.2d 1270, 1276 (10th Cir.1982), cert. denied, sub nom. Ahrendt v. United States, 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983); United States v. May, 622 F.2d 1000, 1008 (9th Cir.), cert. denied, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980); United States v. Cassidy, 616 F.2d 101, 102 (4th Cir.1979).
 
 
 11
 Defendants claim they should have been allowed to submit evidence bearing upon the defense of justification arising under international law. Defendants' argument is that their attempt to halt the manufacture of nuclear missile components, admittedly in violation of domestic law, was an effort to insulate themselves from personal responsibility for United States nuclear military policy which defendants believe is in violation of international law. Other federal courts have considered the availability of an international law defense in cases like this one and have uniformly rejected it. See United States v. Lowe, 654 F.2d 562, 566-67 (9th Cir.1981); United States v. May, 622 F.2d 1000, 1009 (9th Cir.1980); United States v. Shiel, 611 F.2d 526, 528 (4th Cir.1979). As authority for this defense, defendants cite the cases of several of the defendants at the Nuremberg trials after World War II. In those cases, when war crime defendants argued that they had merely followed German domestic law in committing war crimes in violation of international law, the prosecution argued that even individual private citizens have obligations under international law which may require them to violate domestic law to prevent their government from committing violations of international law. See The Flick Case, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 1192 (1952). In The Flick Case, German industrialists were charged with using slave labor and war prisoners in armament production. The Tribunal stated:
 
 
 12
 International law, as such, binds every citizen just as does ordinary municipal law. Acts adjudged criminal when done by an officer of the government are criminal also when done by a private individual. The guilt differs in magnitude, not in quality. The offender in either case is charged with personal wrong and punishment falls on the offender in propria persona. The application of international law to individuals is no novelty.
 
 
 13
 Id. Despite this statement, the Tribunal acquitted the defendant plant owners and managers on a theory of necessity, because they "had no actual control of the administration of [the slave labor program] even where it affected their own plants." Id. at 1196. This defense was applicable except when the defendants had actively participated in procuring an increased production quota which required additional slave laborers. Id. at 1202.
 
 
 14
 In another Nuremberg case cited by defendants, the Allies prosecuted German jurists who enforced laws which made it illegal to interfere with German domestic policies of exterminating minority groups and dissidents. The Justice Case, 3 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 (1951). The defendant jurists pointed to the pressure exerted on them by Hitler and his Ministry of Justice to punish severely any opposition to his policies to eliminate Jews, Poles and other undesirables. Given this influence and the jurists' propensity to submit to it, the War Crimes Tribunal concluded there was "no merit in the suggestion that Nazi judges [were] entitled to the benefit of the Anglo-American doctrine of judicial immunity." Id. at 1024. The Tribunal went on to find the jurists were not justified in punishing private individuals pursuant to domestic law who had acted to impede or escape Nazi programs that were in violation of international law. Id. at 1086.
 
 
 15
 Defendants here misperceive the persons for whom such a Nuremberg "defense" is appropriate. There the German defendants were in positions which required them to participate in sentencing dissidents to death or in utilizing slave labor because domestic law or superior authority ordered them to do so. See generally R. Woetzel, The Nuremberg Trials in International Law 118-22 (1960); Falk, The Nuremberg Defense in the Pentagon Papers Case, 13 Colum.J.Transnat'l L. 208, 229-32 (1974). The question is whether what they were required to do by domestic law could escape international criminal proscription. The War Crimes Tribunal ruled, however, that in certain circumstances those defendants were charged with a duty not to act in accordance with domestic law to avoid liability under international law. Defendants in the case before us stand this doctrine on its head in arguing that a person charged with no duty or responsibility by domestic law may voluntarily violate a criminal law and claim that violation was required to avoid liability under international law. The domestic law simply did not require defendants to do anything that could even arguably be criminal under international law. The attempt to transfer the Nuremberg defense out of context to the case before us was properly rejected by the district court.
 
 
 16
 AFFIRMED.
 
 
 
 *
 Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation