UNITED STATES of America,
Plaintiff,

v.

Reynaldo SANTANA, Jose Davila Gonzalez, Alejandro Garcia Benitez, Wilfredo G. Ortiz, Defendants.

Nos. CRIM. 01–406(DRD), CRIM 01–408(DRD), CRIM 01–409(DRD), CRIM 01–411(DRD).

United States District Court,
D. Puerto Rico.

Nov. 26, 2001.

---

Jorge E. Vega-Pacheco, U.S. Attorney's Office, Criminal Div., Hato Rey, PR, for U.S.

Carlos V. Garcia–Gutierrez, San Juan, PR, for defendant.

### OPINION AND ORDER

DOMINGUEZ, District Judge.

Before the Court are several pending motions, to wit: Defendants' "Motion to Dismiss or to Suppress Based on the Violation of the Posse Comitatus Act" [1]; the "Response of the United States to Defendants' Motion to Dismiss for Alleged Violation of Posse Comitatus" [2]; Defendants' "Motion to Bar Participation of United States Navy Officers or Reserve Officers or Members of the Navy 'Vieques Trial Team' from Participation in the Prosecution of this Action and Motion to Suppress

---

1. *See* Docket No. 9, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 10, Crim. No. 01–409.

2. *See* Docket No. 12, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 13, Crim. No. 01–409.

Any Evidence Obtained or Collected or Prepared by any Such Officer or 'Vieques Trial Team' " [3]; "United States' Response to Defendants' Motion to Dismiss Pursuant to the Posse Comitatus Act" [4]; "United States' in Response to Defendant's Motion to Disqualify Navy Judge Advocates and Incorporated Memorandum of law in Support" [5]; Defendants' "Notice of Intention to Present Affirmative Defense" [6]; and "United States' Response to Defendants' Notice of Intention to Present Necessity Defense at Trial." [7] For the following reasons, the Court finds in favor of the Government on these matters.

# I

## FACTUAL BACKGROUND

Pursuant to the information charged, on June 18, 2001, the Defendants entered Camp Garcia, a naval installation belonging to the United States Navy on the island of Vieques, Puerto Rico. They trespassed in protest against the military training operations that are periodically held there. Shortly after trespassing they were arrested and charged with unlawful entry into naval installation for any purpose prohibited by law, in violation of federal law. 18 U.S.C. § 1382. An initial appearance was held before a Magistrate Judge, who in turn set a bond for each. Defendants later presented several motions to dismiss (or suppress) in accordance to the Posse Comitatus Act ("the Act"). See 18 U.S.C. § 1385. Defendants

also filed a motion announcing their intention of presenting the common law defense of necessity at trial. Hence, these are the two issues before the Court at this moment, and they shall be analyzed *seriatim.*

# II

## POSSE COMITATUS ACT

The first issue raised by the Defendants' is easily dismissed. Through the Act, Congress intended to prohibit the willful use of "any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws" of the United States, save in cases and under circumstances expressly authorized by the Constitution or Act of Congress. 18 U.S.C. § 1385. As suggested by the plain language of the statute, it clearly precludes the use of military personnel in civilian law enforcement.

Defendants' reliance on the Act under the present circumstances is misplaced, however. The Act expressly prohibits the Army and Air Force from enforcing civilian law, but **not** the Navy. See United States v. Yunis, 924 F.2d 1086, 1093 (D.C.Cir.1991) (reviewing the legislative history of the Posse Comitatus Act); Schowengerdt v. General Dynamics, 823 F.2d 1328 (9th Cir.1987). Moreover, the Act is inapplicable to on-base violations by civilians. United States v. Banks, 539 F.2d 14 (9th Cir.1976); United States v. Acosta–Cartagena, 128 F.Supp.2d 69 (D.Puerto Rico 2000). In view of the fact that pursuant to the charges, the Defen-

---

**3.** See Docket No. 13, Crim. Nos. 01–406, 01–408, and 01–411; Docket No. 14, Crim. No. 01–409.

**4.** See Docket No. 15, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 16, Crim. No. 01–409.

**5.** See Docket No. 16, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 17, Crim. No. 01–409.

**6.** See Docket No. 17, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 18, Crim. No. 01–409.

**7.** See Docket No. 18, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 19, Crim. No. 01–409.

dants, all civilians, trespassed Camp Garcia, a military base under the control of the United States Navy, the Court finds that the Act is clearly inapplicable to them. Therefore, the dismissal and suppression of evidence requested by them is hereby denied.

## III

### THE NECESSITY DEFENSE

The other issue raised by the Defendants is the applicability of the necessity defense. In short, the necessity defense requires a balancing test to determine whether a criminal act was committed to avoid a greater harm. The common elements of the necessity defense found in all common law and statutory definitions include the following: 1) the actor was faced with a choice of evils and chose the lesser evil; 2) the actor acted to avoid the most significant evil; 3) the remedy is not disproportionate to the evil sought to be avoided (*i.e.*, causal relationship between his acts and the harm to be averted); and 4) there were **no adequate legal means or alternatives** to escape the harm. *See United States v. Maxwell*, 254 F.3d 21, 27 (1st Cir.2001).

The application of the necessity defense in the United States has been attempted in the context of civil disobedience since the era of the Vietnam War. Recently, its application has been raised in cases against individuals practicing what they believe to be "civil disobedience" in the Island of Vieques, Puerto Rico. Provided the "unique" and "unparalleled" relationship Puerto Rico has with the United States, *Califano v. Torres*, 435 U.S. 1, 3, n. 4, 98 S.Ct. 906, 907, n. 4, 55 L.Ed.2d 65 (1978)(per curiam) or be it merely a "colonial" relationship, *Igartua v. United States*, 229 F.3d 80, 89 (1st Cir.2000) (Torruella, J., concurring), the application of the necessity defense in the Vieques context requires close examination. Accord-

ingly, the Court examines the application of the necessity defense found in federal case law, and thus, its application to civil disobedience in the island of Vieques.

The **key requirement** of the necessity defense is that no *"reasonable"* legal option exist for averting the harm. That is, the no-legal-alternative element of the defense requires that the threat be such that it leaves open no reasonable legal recourse, as established by the Supreme Court in *United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 635, 62 L.Ed.2d 575 (1980) ("if there was a **reasonable, legal alternative to violating the law** … the defense[ ] will fail"). Seeking guidance on the subject matter, the Court briefly examines other Circuit Court opinions decided after *Bailey*. *Id.*

In *United States v. Quilty*, 741 F.2d 1031 (7th Cir.1984) (per curiam), several defendants were convicted of violating a statute against entering military property. The Court of Appeals affirmed the District Court's determination to exclude the defense of necessity, holding that the defense did not justify protestors' violation of statute against entering military property because there were other **reasonable** alternatives for protesting nuclear war other than by violating the statute against entering military property. There the Court stated that

[i]t is … impossible … to argue that there are not **reasonable** alternatives to violating the law under which these defendants were convicted. There are **thousands of opportunities** for the propagation of [their] message: **in the nation's electoral process; by speech on public streets, in parks, in auditoriums, in churches and lecture halls; and by the release of information to the media, to name only a few.**

*Id.* at 1033 (emphasis added).

In *United States v. Dorrell*, 758 F.2d 427 (9th Cir.1985) a defendant was convicted in

federal court for willfully injuring property of United States and for knowingly entering a military reservation for an unlawful purpose. The convicted "civil disobedient" appealed. The Court of Appeals, however, affirmed holding *inter alia* that the defendant's asserted necessity defense failed where the defendant had recourse to **the political process** to redress his concern regarding nuclear war. Moreover, the Circuit Court held he did not establish that his entry into the base and his spray-painting of government property could be reasonably anticipated to lead the termination of the nuclear missile program and aversion of nuclear war and world starvation. The Court further explained:

Those who wish to protest in an unlawful manner frequently are impatient with less visible and more time-consuming alternatives. Their impatience does not constitute the "necessity" that the defense of necessity requires. So it is here. Dorrell made no showing of the required "necessity." "The defense of necessity does not arise from a 'choice' of several sources of action; it is instead based on a real emergency." Consequently, **"if there was a reasonable, legal alternative to violating the law,"** **the defense fails.**

Although it is doubtful that Dorrell could bring a legal challenge to United States nuclear policy, he does have recourse to the political process to redress his concerns regarding nuclear war. **"There are thousands of opportunities for the propagation of the anti-nuclear message: in the nation's electoral process; by speech on public streets, in parks, in auditoriums, in churches and lecture halls; and by the release of information to the media, to name only a few."** The availability of this option prevents Dorrell from raising the necessity defense in the instant case.

 · · · · ·

... Dorrell differs little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed. Moreover, it may be he understates the effectiveness of the political process in this particular instance. **To accept Dorrell's position would amount to recognizing that an individual may assert a defense to criminal charges whenever he or she disagrees with a result reached by the political process.** While the policy underlying the necessity defense is the promotion of greater values at the expense of lesser values, it does not follow that the law should excuse criminal activity intended to express the protestor's disagreement with positions reached by the lawmaking branches of the government. To do otherwise would deprive the protest of the validation of its sincerity that lawful punishment provides, force the courts to choose among causes they should make legitimate by extending the defense of necessity, and transgress the principles of separation of powers.

*Id.*, at 431–32 (emphasis added) (internal citations and footnotes omitted).

In *United States v. Montgomery*, 772 F.2d 733 (11th Cir.1985), defendants were convicted of depredation of United States Army property and conspiracy. After appealing their convictions, the Court of Appeals for the Eleventh Circuit also rejected the applicability of the necessity defense in the context of "civil disobedience," *inter alia,* since defendants failed to demonstrate lack of "reasonable legal alternatives" to their criminal act. Therefore, holding that they were not entitled to have submitted to the jury the justification defense of necessity, the Circuit Court affirmed the lower court's determination.

Defendants' proffer on lack of alternatives is **insufficient**. Although defendants sought to offer evidence that "the normal political process have been rendered ineffective to meet the dangers created by nuclear arms build-up," it is clear that defendants had **reasonable legal alternatives** to the destruction of Government property, including **peaceful protests** and **petitioning Congress or the President.... People are not legally justified in committing crimes simply because their message goes unheeded.**

*Id.*, at 736 (emphasis added).

In *United States v. Kabat*, 797 F.2d 580 (8th Cir.1986), three "civil disobedient" protesters were convicted of conspiracy, willful destruction of government property, sabotage, and entering property within the control of the United States for purpose prohibited by law. A fourth was convicted of willful destruction of government property and sabotage. The District Court, *inter alia*, refused to give the jury instruction on the defense of necessity. The convicted protesters appealed, but the Circuit ruled against them and affirmed the lower court. Citing *Dorrell*, the Circuit Court reiterated that protestors cannot create "necessity" through their own impatience with the "less visible" and more "time-consuming alternatives." The Court also underscored that "a **lack of results might mean only that the will of the majority, legitimately expressed, had prevailed.**" *Kabat*, at 591. The Court in *Kabat* also based its refusal to admit the defense of necessity on the constitutional doctrine of separation of powers.

> **The necessity defense was never intended to excuse criminal activity by those who disagree with the decisions and policies of the lawmaking branches of government:** in such cases the "greater harm" sought to be prevented would be the course of action chosen by elected representatives, and a court in allowing the defense would be making a negative political or policy judgment about that course of action. Judgments of that type, however, are not the province of judge (or jury) under the separation of powers established by our Constitution.

*Id.* at 591–92 (emphasis added).

In the landmark case of *United States v. Schoon*, 971 F.2d 193 (9th Cir.1991), the Ninth Circuit Court of Appeals held squarely that "necessity can **never be proved in a case of indirect civil disobedience.**" *Id.*, at 197 (emphasis added). That Court in *Schoon* reasoned that "[b]ecause congressional action can *always* mitigate this 'harm,' lawful political activity to spur such action will always be a legal alternative. On the other hand, **we cannot say that this legal alternative will always exist in cases of direct civil disobedience....**" *Id.*, at 198. Following the Court's recognition that "the law **implies**" that the reasonableness requirement is consistently present, it also explained that the reasonableness requirement will be satisfied merely "by the **possibility** of congressional action." *Id.* (emphasis added). "**[P]etitioning Congress to change a policy is *always* a legal alternative in such cases, regardless of the likelihood of the plea's success. Thus, indirect civil disobedience can never meet the necessity defense requirement that there be a lack of legal alternatives.**" *Id.*, at 199 (emphasis added). Finally, the Court in *Schoon* revealed other potential intentions of the "civil disobedient": "What these cases are really about is gaining notoriety for a cause—the defense allows protestors to get their political grievances discussed in a courtroom. It is precisely this political motive that has left some courts ... uneasy." *Id.* at 199.

In *United States v. Turner*, 44 F.3d 900 (10th Cir.1995), the defendant, Ms. Turner, scaled the fence surrounding a Women's Health Care Services clinic with about forty other protesters. At trial, she testified she was at the clinic as a "sidewalk counselor" and entered the clinic in order to pray and place her body in front of a woman who was attempting to enter the clinic where abortions were practiced.

She resisted arrest and was indicted for assault on a federal officer in violation of and obstruction of a federal court order. The assault charge was dropped and she was eventually convicted by a jury on the obstruction charge. After the district court denied her motion for judgment of acquittal, she appealed. The Circuit Court of Appeals vacated and remanded that ruling on the ground the district court judge should have recused himself from presiding over the trial. The defendant was retried and again convicted. Judgment was entered against her and a sentence of one year supervised probation imposed. A second appeal followed. The convicted protestor's primary claim on appeal was that the district court erred in refusing to instruct the jury on the defense of necessity. The Court of Appeals, however, held that the necessity defense did not apply as a matter of law:

> There is little question but that the goals of educating women concerning medical knowledge about abortions and alternatives to abortion could be achieved by **any number of legal alternatives.** For instance, Ms. Turner could go door-to-door conveying her views, or via publication, or simply continue her otherwise lawful protests. Plainly, women can be, and in fact are educated on issues concerning abortion by legal means; **violating the laws of the United States and ignoring orders of the federal courts are not the only way of doing so.**
>
> . . . . .
>
> ... [T]o permit the defense of necessity under facts similar to those presented here would not only be **a recipe for disaster,** but would call into question the very foundations of civil society and constitutional democracy.

*Id.* at 902–903 (internal citations omitted).

Recently, the First Circuit Court of Appeals ruled on a case very much on-point. In the calendar year 2000, approximately 400 persons were prosecuted for protest-related trespasses. Maxwell, the defendant, joined this effort: the authorities arrested him three times in quick succession (June 1, June 13, and June 21, 2000) for entering Camp Garcia without the permission of its commanding officer. Pursuant to regulations promulgated by the Department of the Navy, Camp Garcia is a "closed" base, meaning that entry by members of the general public requires permission from the commanding officer. Maxwell filed a pretrial motion, accompanied by an exegetic offer of proof, reflecting his desire to present affirmative defenses based upon necessity and international law. The government objected and the district court ruled, as a matter of law, that the proposed defenses could not be maintained because of the lack of a proper predicate. The court, sitting without a jury, found that Maxwell had knowingly entered Camp Garcia without leave and in so doing had violated federal law. The court thereupon imposed a thirty-day incarcerative sentence. An appeal followed, and the First Circuit Court ruled as follows:

> In the case at hand, Maxwell testified at trial to the many avenues he has explored to further nuclear disarmament (e.g., participating in letter-writing campaigns, attending a nonproliferation treaty conference, and taking part in

demonstrations). His level of commitment is laudable, but the more panoramic range of his activities clearly demonstrates that he has many legal options for advancing his political goals. The fact that Maxwell is unlikely to effect the changes he desires through legal alternatives does not mean, ipso facto, that those alternatives are nonexistent. Accepting such an argument would be tantamount to giving an individual carte blanche to interpose a necessity defense whenever he becomes disaffected by the workings of the political process.

Our conclusion that Maxwell had legal alternatives to violating the law finds ample support in the case law. **Without exception, the decided cases teach that a defendant's legal alternatives will rarely, if ever, be deemed exhausted when the harm of which he complains can be palliated by political action.** The case at hand falls within this general rule.

In an effort to wiggle free of these precedents, Maxwell suggests that all legal alternatives were foreclosed to him because he is a resident of Puerto Rico, and the democratic process "functions in one manner in the United States, and another in Puerto Rico." **While it is true that Puerto Rico does not enjoy the same representation in Congress as the fifty states, this surely does not mean that all political avenues are closed to those who live in Puerto Rico. Indeed, Maxwell's own activities in support of the cause of nuclear disarmament belie this suggestion.**

*Id.,* at 28–29 (emphasis added) (internal citations omitted).

 Lastly, the necessity defense can only be admitted if it was a "**reasonable** alternative." *Bailey,* 444 U.S. at 410, 100 S.Ct. at 635 (emphasis added). Regardless of efforts to promote a different standard that might guarantee effectiveness to the legal-alternatives requirement, "reasonable alternatives" was the standard adopted by the Supreme Court in *Bailey,* and continues to stand today.

Many have openly and severely criticized the "reasonableness" standard adopted by the federal courts and applied by these to the issue of what legal alternatives civil disobedients may have had. Some have suggested that instead of reasonable alternatives, the standard should be "effective" alternatives:

> A more sophisticated analysis would focus on what legal alternatives are 'reasonable.' [Case law] suggests that what is available is reasonable, but this is not always true. Reasonable must mean more than available; it must imply effective. Surely a jury can believe that there are situations in which constitutionally protected free speech has proved so ineffective in changing undesirable laws or policies that a reasonable social reformer would feel compelled to resort to another strategy. Thus, some civil disobedients can raise a question of fact as to whether reasonable legal alternatives exist.

Note, Steven M. Bauer and Peter J. Eckerstrom, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience,* 39 STAN. L. REV. 1173, 1179–80 (1987) (footnotes omitted); *see also* Note, Laura J. Schulkind, *Applying the Necessity Defense to Civil Disobedience Cases,* 64 N.Y.U. L. REV. 79 (1989) (arguing that reasonable must mean more than available; it must imply effective).

Notwithstanding, federal courts have consistently rejected that view reasoning simply that people living in a civilized democratic society cannot be "legally justified in committing crimes simply because their message goes unheeded." *Montgomery,* 772 F.2d at 736. Moreover, the Supreme Court has flatly indicated that one princi-

ple remains constant, to wit, if there was a **reasonable,** legal alternative to violating the law the defense must fail. *See Bailey,* 444 U.S. at 410, 100 S.Ct. at 635 (emphasis added).

Furthermore, there are sound, social principles firmly supporting this legal standard. As one commentator has observed,

> "skepticism about perfect information and pure democracy has, of course, some foundation in fact. But it does not follow that a person should be allowed to break the law just because his efforts to use traditional democratic channels do not always work. Inevitably, in a democracy—even a 'perfect' one-some lobbying efforts will not 'work' because the majority will reject them. Democratic principles do not promise that all ideas will prevail; they promise only that the ideas that do prevail, do so because a majority of representatives has endorsed them. In the absence of factors suggesting discrimination or other systematic defects in the representative process, the products of that process should be respected.... Protest groups should not be able to argue, then, that their failure to succeed in the democratic process should permit them to circumvent it."

Comment, Brent D. Wride, *Political Protest and the Illinois Defense of Necessity,* 54 U. CHI. L. REV. 1070, 1085 (1987).

The Court is well aware of the inequality that Defendants suffer as residents of Puerto Rico. Like the many chamberlains that, praising the emperor's new clothes, "walked along behind carrying high the train that wasn't there," [8] so do many praise the "uniqueness" of Puerto Rico's relationship with the United States, while carrying-on evermore proudly and chanting "The emperor's procession must go

on!" Yet, like the voice of an innocent child (as the story goes), it is undeniable that "[t]he United States citizens residing in Puerto Rico to this day continue to have no real say in the choice of those who, from afar, really govern them...." *Igartua,* 229 F.3d at 88 (Torruella, J., concurring). Furthermore, there is no question that the residents of Puerto Rico suffer the consequences of "the inferior nature of the United States citizenship" they hold. *Id.,* at 87. "Undoubtedly the most glaring evidence of this egregious disparity is the fact [Puerto Ricans] do not elect a single voting representative to a federal government that exercises almost absolute power over them." *Id.,* at 86. And although Puerto Ricans do elect a Resident Commissioner to represent their interests before Congress, it is obvious that this official's lack of vote "diminishes his ability to effectively represent them." *Id.,* note 6. In sum, "Puerto Rico remains a colony" and "[t]he national disenfranchisement of these citizens ensures that they will never be able, through the political process, to rectify the denial of their civil rights in those very political processes." *Id.,* at 89; *see also Romeu v. Cohen,* 265 F.3d 118, 127–30 (2nd Cir.2001) (Circuit Judge Leval, author of the Court's opinion, making a few personal observations on "the problem" of Puerto Rico's disenfranchisement); *Popular Democratic Party v. Com. of Puerto Rico,* 24 F.Supp.2d 184 (D.Puerto Rico 1998) (extensively reviewing Puerto Rico's juridical status and Congress' broad and practically unlimited powers of the Island); Juan R. Torruella, THE SUPREME COURT OF PUERTO RICO: THE DOCTRINE OF 'SEPARATE BUT UNEQUAL' (1985).

Nevertheless, the Defendants must be mindful that whether or not a particular elected officer possesses the power of vote in Congress is not, in the end, dispositive of the inquiry raised by the Defendants.

---

8. Hans Christian Andersen, THE EMPER- OR'S NEW CLOTHES (1837).

Moreover, the Nation's electoral process is merely **one of many** legal alternatives the Defendants' have, and, as such, **it need only be reasonable,** not effective.[9] Furthermore, even if the Court were to assume, for argument sake, that the applicable standard was "effective legal alternatives" (as opposed to "reasonable legal alternatives"), and that Puerto Rico enjoyed state-like powers, nonetheless that could **never** serve as a guarantee to the effectiveness of Defendants' electoral and political alternatives. Nonetheless, Puerto Rico has never enjoyed state-like powers; and the applicable standard is not "effective" legal alternatives, but "reasonable" ones.

In the instant case, the Court finds that Defendants have many legal alternatives and thus are bared from raising the necessity defense. The Court is bound in its analysis by the principle that remains as constant as when the Supreme Court announced it in *Bailey:* "if there was a **reasonable,** legal alternative to violating the law ... **the defense[ ] will**

fail." 444 U.S. at 410, 100 S.Ct. at 635 (emphasis added). Therefore, regardless of Puerto Rico's unquestionable inequality within our Nation's political and constitutional framework,[10] Defendants' contention must nevertheless fail.

Furthermore, the electoral process of the Nation—even in the context of "the sorry state of Puerto Rico United States affairs"[11]is merely one of many legal alternatives Defendants have available. Transgressing federal law, however, is clearly not one of them. It is simply impossible to argue, as Defendants have, that there were not **reasonable** alternatives to violating the law. *See Quilty,* 741 F.2d at 1033. Clearly, Defendants had other **reasonable legal alternatives** to trespassing naval property, including, *inter alia,* **otherwise lawful and peaceful protests,** as many people that share their political views have done. **But Defendants are not legally justified in violating federal law simply because they feel their message goes unheeded.** *See Montgomery,* 772 F.2d at 736. Although some may disagree, this

9. Though troublesome and highly questionable, Puerto Rico's *statuts quo* can be considered "reasonable" within the United States' Constitutional scheme, in light of the Supreme Court's case law. For almost a century, the Supreme Court has consistently validated Puerto Rico's anomalous situation through the *Insular Cases. See Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Ocampo v. United States,* 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *DeLima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901). The *Insular Cases,* a set of narrowly divided decisions, established that Congress has plenary power over Puerto Rico under the "territorial clause" of the Constitution. As such, that Court has reiterated that Congress has power over the internal and external affairs of Puerto Rico, and that the residents of the Island, though U.S. citizens,

are not protected by the Bill of Rights, except insofar as to those guarantees that are considered "fundamental" (which, in turn, are to be determined on a case-to-case basis), and those guarantees that are explicitly extended to the Island by Congress. It follows then, that if Puerto Rico's *status quo* has been consistently held to be constitutionally acceptable, then it may be also considered "reasonable," for purposes of this Court's analysis.

10. Congress, acting under the Territory Clause, may—as it often does—treat Puerto Rico differently from States so long as there is a "rational basis" for its actions. *See Harris v. Rosario,* 446 U.S. 651, 651–652, 100 S.Ct. 1929, 1930, 64 L.Ed.2d 587; *Califano v. Torres, supra.*

11. Torruella, *Hacia Donde Vas Puerto Rico?* 107 YALE L.J. 1503, 1507 (1998) (reviewing Jose Trias Monge, PUERTO RICO: THE TRIALS OF THE OLDEST COLONY IN THE WORLD (1997)).

Court strongly believes that anarchy and social chaos are never acceptable.[12] Defendants seem to be impatient with less visible and more time-consuming alternatives. But their impatience cannot constitute a "necessity." *Dorrell*, 758 F.2d at 431. As the Supreme Court stated in *Walker v. City of Birmingham*, 388 U.S. 307, 321, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967), "[o]ne may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civiliz-

ing hand of law, which alone can give abiding meaning to constitutional freedom." [13] In short, "necessity can never be proved in a case of indirect civil disobedience." *Schoon*, 971 F.2d at 197. Accordingly, Defendants' intended reliance on the necessity defense is hereby denied.[14]

## IV

## CONCLUSION

In the instant case, Defendants are charged pursuant to the information pro-

12. *The State Made Me Do It*, 39 STAN. L. REV. at 1189–90

13. The Court notes that several federal and state legislators and other important personalities have joined in the Vieques cause. *See e.g. United States v. Alfred Sharpton*, Crim. No. 01–326(JAF); *United States v. Jose "Denis" Rivera*, Crim. No. 01–328(JAF); *United States v. Robert Kennedy*, Crim. No. 01–215(HL); *United States v. Luis Guitierrez–Olmedo*, Crim. No. 01–249(SEC); *United States v. Jackeline Jackson*, Crim No. 01–419(DRD); *United States v. Norma Burgos–Andujar*, Crim. No. 01–213(HL); *United States v. Damaso Serrano*, Crim. No. 01–314(HL); *United States v. Rafael Cordero–Santiago*, Crim No. 01–470(JAG); *United States v. Velda Gonzalez*, Crim. No. 01–248(SEC); *United States v. Edward James–Olmos*, Crim. No. 01–216(DRD); *United States v. Draco Cornelio–Rosa*, Crim. No. 261(SEC).

14. The Court cannot promote civil disobedience nor will it pass judgment on the social or political causes advocated by those that consider themselves "civil disobedients"—such as the Defendantssince judgments of this nature are not within the province of a federal judge. The Court, however, considers that the following expressions are worth noting. They were made by an advocate of "civil disobedience" regarding the philosophical inappropriateness of raising the necessity defense in the context of civil disobedience:

Generally, civil disobedience is an unlawful act that is meant to urge reconsideration of a law or policy without threatening the structure of the community in which it is carried out. Three aspects of civil disobedience counsel that its practitioners should

accept the legal consequences of their acts. First, civil disobedience pursues a civil society within the confines of the social contract. Second, it seeks social reform through persuasion. Third, it requires its practitioners, as moral political actors, **to be ethically consistent. Accepting the punishment for the unlawful act is important to each of these premises. Attempting to avert punishment by raising necessity claims may undermine the justifications for civil disobedience;** at the very least, the disobedient forgoes a strategically important symbolic event.

... **Anarchy and social chaos ... offer no possibility for social reform.**

Thus, the civil disobedient **must accept the enforcement of laws with which he disagrees if he is to expect enforcement of this prospective social agenda.** For this reason, he must ritualize his respect for the law in general, even as he uses the persuasive strategy of defying a particular law. The reformer can achieve this by **accepting the punishment for his unlawful acts.**

The civil disobedient must demonstrate his respect for law not only to demonstrate prospective philosophical consistency, but also to resolve the present philosophical dilemma of his own lawbreaking. In acting on conscience, the civil disobedience asserts a subjective moral vision. **He cannot expect that vision to be binding on the rest of society unless it is endorsed through the democratic process. Each member of society must accept that the rest of society will not share all of his idiosyncratic visions.** *The State Made Me Do It*, 39 STAN. L. REV. at 1189–90 (emphasis added; footnotes omitted).

vided to have trespassed Camp Garcia, a military base belonging to the United States Navy. Because the Posse Comitatus Act is not applicable either to the Navy or to on-base violations by civilians, Defendants' motion to dismiss is unfounded. *United States v. Banks*, 539 F.2d 14 (9th Cir.1976); *United States v. Acosta–Cartagena*, 128 F.Supp.2d 69 (D.Puerto Rico 2000). Moreover, "while it is true that Puerto Rico does not enjoy the same representation in Congress as the fifty states, this surely does not mean that all political avenues are closed to those who live in Puerto Rico." *Maxwell*, 254 F.3d at 29. Hence, the necessity defense is unavailing. Moreover, since Defendants had many other "reasonable" political avenues available—*e.g.*, the electoral process and/or speech on public streets, parks, auditoriums, churches, lecture halls and/or releases to the media, **regardless of the likelihood of their success**—they cannot rely on the necessity defense. *Id.* **WHEREFORE,** the Court finds in favor of the Government [15] on these matters.[16] Thus, Defendants' motions are **DENIED.**

**IT IS SO ORDERED.**

**15.** Therefore, the following motions filed by the Government are **granted:** A) Docket No. 12, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 13, Crim. No. 01–409 (*see* note 2, *supra*); B) Docket No. 15, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 16, Crim. No. 01–409 (*see* note 4, *supra*); C) Docket No. 16, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 17, Crim. No. 01–409 (*see* note 5, *supra*); D) Docket No. 18, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 19, Crim. No. 01–409 (*see* note 7, *supra*).

**16.** The following motions filed by Defendants are **denied:** A) Docket No. 9, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 10, Crim. No. 01–409 (*see* note 1, *supra*); B) Docket No. 13, Crim. Nos. 01–406, 01–408, and 01–411; Docket No. 14, Crim. No. 01–409 (*see* note 3, *supra*); C) Docket No. 17, Crim. Nos. 01–406, 01–408 and 01–411; Docket No. 18, Crim. No. 01–409 (*see* note 6, *supra*).