[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 30, 2005
THOMAS K. KAHN
CLERK

No. 05-10701
Non-Argument Calendar

_____

D. C. Docket No. 04-60268-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROSELANDE  LOUIS,
a.k.a. Giannie Tarah Ladouceur,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 30, 2005)

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Roselande Louis appeals her convictions for using a false and altered

passport in an attempt to gain entry into the United States, in violation of 18 U.S.C. § 1543, and using a forged, counterfeited, altered, and falsely made entry document, in violation of 18 U.S.C. § 1546(a). Louis raises two issues on appeal: (1) whether her statements made to Customs officers during an interrogation, which were given without Miranda warnings, were voluntary and admissible during her cross-examination and the government's rebuttal case; and (2) whether the district court abused its discretion in refusing to give an instruction on the defense of duress. After review, we affirm.

## I. BACKGROUND

**A.     Evidence at Motion to Suppress Hearing**

After her indictment on the above charges, Louis filed a motion to suppress statements that she made to immigration officers during her secondary inspection. Louis's motion alleged that the statements were given without Miranda warnings and were involuntary and the product of coercion. The government responded that because Louis had not been in custody when she made the statements, Miranda warnings were not required.

At the hearing on Louis's motion to suppress, the district court heard the following evidence from Customs Officer Jannes Lewis, who was the only witness at the hearing. Louis did not testify.

2

On October 2, 2004, Louis arrived into the Ft. Lauderdale airport on a flight from Port-au-Prince, Haiti. Initially, Louis went to primary inspection where Inspector Rudy Paredes interviewed her. Paredes suspected that Louis had a tampered visa or passport, and Paredes sent Louis to secondary inspection. Paredes then asked Louis to tell him her true name, but Louis became uncooperative and unresponsive. Louis indicated that she was uncomfortable with Inspector Paredes. At that point, Officer Lewis took over the interview.

Officer Lewis explained to Louis that Officer Lewis was authorized to take sworn statements regarding Louis's entry into the United States, and that it had been determined that Louis possibly was inadmissible. Officer Lewis further explained that if Louis was fearful of returning to Haiti, she would be given an opportunity to speak with an asylum officer regarding her fears, and that Louis should indicate whether she had such fears because she might not get another opportunity.

Louis responded that she understood, and agreed to give true and complete answers. Louis, however, told Officer Lewis that her name was Giannie Tarah Ladouceur. After Officer Lewis told her that the inspectors had contacted her aunt in the United States, Louis admitted that her real name was Roselande Louis. Louis then explained that she had given two photographs of herself to her aunt in

3

Haiti, and that an unidentified male had provided her the travel documents presented to Inspector Paredes. Louis did not express any fears about returning to Haiti. Louis admitted that she knew that the documents had been altered.

Officer Lewis further explained that because Louis was at the border, she could not leave the inspection area and enter the airport proper until she was admitted into the United States. Further, whenever persons undergoing immigration examination had to leave the inspection area to use the restroom, they were escorted by inspectors to prevent them from entering the airport.

The district court denied Louis's motion to suppress, determining that Louis's interrogation was routine, not custodial, and thus did not require Miranda warnings. Further, the district court found that Louis's statements were freely and voluntarily given.

Prior to trial, the government learned that Louis may have been placed in a holding cell during the secondary inspection, and thus, she may have been in custody. Based on this information, the government decided to use Louis's statements only for the purpose of impeachment.

**B.    Evidence at Trial**

During the government's case-in-chief, Officer Paredes testified that he inspected Louis when she arrived at the airport from Port-au-Prince, Haiti. Louis

handed him two Haitian passports, one containing a non-immigrant visa and a Customs Declaration Form I-94, all with the name of Giannie Tarah Ladouceur. When Paredes looked at the passport containing the non-immigrant visa, it looked as if the seal had been altered. Paredes referred Louis for secondary inspection.

During the defense part of the case, Louis testified about the conditions in Haiti. She further testified that on October 2, 2004, her uncle took her to the airport. At the airport, Louis's uncle gave her travel documents that did not have her name on them. Louis did not know where she was going until she heard the announcement for her flight.

Louis conceded that: (1) the two passports that the government admitted into evidence were the passports she had used; (2) the name on the passports was not hers; (3) the passports were fake or forged; and (4) she filled out the I-94 form in a fake name. After presenting her documents to a man in the United States, Louis was asked to take a seat. Louis sat for about an hour-and-a-half, and then a woman escorted her to a room and asked her to take her clothes off. The woman locked the door and left her alone in the room.

At about 5:30 p.m., someone brought Louis to speak with Officer Paredes. After an interpreter came in, they asked her if she was aware that the passport was not hers. Louis admitted that she told them that the name on the passport was not

hers. She stated that the room was full of officers and that one of them said "Just send her back. Ship her back to Haiti." Louis stated that she started crying, and they took her back to the room where she had been held before.

After this testimony, Louis's defense counsel renewed his objection to the admissibility of Louis's statements to the officers and requested that the government be prohibited from eliciting them during cross-examination. The district court stated that it had already found that the statements were freely and voluntarily given and that it had not heard anything that would change that. Specifically, the district court stated "I think I already found that the statements were freely and voluntarily made."

Louis continued to testify, stating that eventually she was escorted to an area where Officer Paredes questioned her. They asked her if her name was Ladouceur, and when she told them that it was, a "lady replied, '[w]ell, that's not your name. If you don't want to tell us your name, you know, we are not going to be too pleased.' And then one was yelling into the background, you know, 'Back to Haiti. Back to Haiti.'" Louis stated that she became upset and started crying, and they told her that they were going to bring in a supervisor. When the supervisor came in, Louis told him that she was not comfortable with anyone there, and later, Officer Lewis came in and continued the interview.

6

Louis admitted that she told Officer Lewis that her name was Giannie Tarah Ladouceur, that neither she nor her parents were lawful United States citizens, and that she presented a passport and visa for inspection. Louis admitted that after being asked how she got the passports, she told Officer Lewis that she went to a photographer and took passport pictures, that everything else was taken care of by somebody else, and that a man came to the house two times to talk with her aunt about the passports. Louis told Officer Lewis that she was not aware that the passport was illegal. Louis further admitted that she eventually told Officer Lewis her real name. Louis also admitted that she told Officer Lewis that she was not afraid to go back to her country, and did not tell any of the officers about the incidents in Haiti because she was afraid of the officers because they worked for the government.

Louis also testified that the reason she came to the United States and gave the inspectors the fake name on the passports was because she was being persecuted and told she would be eventually killed, and she wanted to save her life.

On cross-examination, Louis admitted that she lied to the inspectors about her correct name and birth date. Louis also admitted that she knew that the entry documents were false, but explained that she simply wanted to save her life. Louis denied that the Customs officers read a statement to her explaining that if she was

7

afraid to return to her own country, she should say so during the interview, and that if she expressed such fear, she would be able to speak confidentially to another officer who would determine her claim. Louis also admitted that she did not tell Inspector Hakime or Officer Lewis that she was afraid of them.

However, Inspector Hakime testified that he was the interpreter during the secondary inspection of Louis and that he translated into Creole the provision that Officer Lewis read which stated that a person who was afraid to return to her country should disclose such fears during the interview. Inspector Hakime testified that Louis was asked several times whether she feared returning to Haiti, and each time she responded that she did not have such fears. Inspector Hakime also stated that when asked, Louis stated that she was not afraid of him or of Officer Lewis.

Inspector Hakime also explained that passengers were never strip-searched at the border during an immigration examination, and that the most intrusive search conducted was a pat-down search of a passenger executed by an officer of the same sex.

## C.    Duress Defense

After all of the evidence, Louis requested that the district court instruct the jury on the defense of duress. The government argued that the evidence had shown

8

that Louis had available to her a number of legal alternatives other than breaking the law and that she had not attempted to pursue any of them. The government further argued that the evidence established that Louis had been under no imminent threat or danger. The district court denied Louis's requested instruction, determining that Louis had "other reasonable legal alternatives" than breaking the law.

The jury convicted Louis on both counts. Louis then filed a motion for a new trial, alleging that the district court erred by denying her motion to issue a duress or coercion instruction to the jury. The district court denied Louis's motion for a new trial.

## II. DISCUSSION

### A.    Statements to Customs Officers

On appeal, Louis first argues that her statements to Customs officers, which were given without <u>Miranda</u> warnings, were involuntary because she was mentally weakened, isolated, and overwhelmed. Specifically, Louis contends that she: (1) had arrived in the United States after having been beaten, threatened for months, and told she would be killed if she returned to Haiti; (2) was locked in a holding cell, strip-searched, and stripped of her personal effects; (3) was taken to a small cubicle filled with Customs officers, one of whom yelled "Send her back to Haiti;"

9

and (4) was terrified of one of the officers who interviewed her.[1]

Custodial statements made by a defendant without the benefit of Miranda warnings are not admissible in the prosecution's case-in-chief, but may be used for impeachment purposes, provided that the statements are voluntary. See McGriff v. Dep't of Corrs., 338 F.3d 1231, 1236 (11th Cir. 2003), cert. denied, 540 U.S. 1118, 124 S. Ct. 1065 (2004). Even though the government used Louis's statements only for impeachment purposes, we still must determine whether her statements to Customs officials were voluntary.

"When a defendant challenges the voluntariness of a confession, the government bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." United States v. Grimes, 142 F.3d 1342, 1350 (11th Cir. 1998) (citations omitted). Whether the statement was voluntary is examined in light of the totality of the circumstances. Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir.), cert. denied, 540 U.S. 951, 124 S. Ct. 390 (2003). "Among the factors we must consider are the defendant's intelligence, the length of [her] detention, the nature of the interrogation, the use of any physical force against [her], or the use of

---

[1]We apply a mixed standard of review to the district court's denial of a suppression motion, reviewing findings of fact for clear error and the application of the law to those facts de novo. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). "Voluntariness is as much a legal notion as a factual one" and thus, our review of voluntariness is de novo." Housel v. Head, 238 F.3d 1289, 1299 (11th Cir. 2001).

10

any promises or inducements by police."  Id. (citations omitted).

There is ample evidence from the record, as outlined above, to support the district court's determination that Louis's statements to the Customs officers were voluntarily given.  Indeed, Louis assured Inspector Hakime (the interpreter) that she was not afraid of Officer Lewis or Inspector Hakime.  Further, Louis stated that she was not afraid to return to Haiti.

We recognize that Louis claims that she was strip-searched and put in a room with officials shouting that she should be sent back to Haiti.  However, Inspector Hakime testified at trial that passengers were never strip-searched during an immigration examination.  Officer Lewis testified at the suppression hearing that she had no recollection of any officer or inspector telling Louis that she should be sent back to Haiti.  In any event, assuming officers stated that Louis should be sent back to Haiti, Louis has failed to show how those remarks were coercive.  Indeed, Louis told Officer Lewis that she was not afraid to go back to Haiti.

Moreover, there is no evidence in the record suggesting that Customs officers used physical force or threatened Louis, made promises or inducements to her, or treated her in an unprofessional manner.  Rather, the evidence shows that Louis was safe in the Fort Lauderdale airport and that although she could have applied for asylum, she instead attempted to gain entry by presenting false

11

documents. We find no reversible error in the district court's determination that Louis's statements were voluntary.

## B. Duress Defense

Louis next argues that the district court erred in refusing to instruct the jury on the defense of duress.[2] We disagree.

"In order to have the defense submitted to a jury, a defendant must first produce or proffer evidence sufficient to prove the essential elements of the defense." United States v. Montgomery, 772 F.2d 733, 736 (11th Cir. 1985) (citation omitted). "The threshold burden is extremely low: The defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995) (internal quotation marks, brackets, elipses, and citation omitted).

To establish a defense of duress, a defendant must show that she performed or consented to the unlawful act because: (1) the defendant was under unlawful and present, imminent and impending threat of death or serious bodily injury; (2) the defendant did not negligently or recklessly place herself in a situation where she

---

[2]We review a district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Garcia, 405 F.3d 1260, 1273 (11th Cir. 2005). "[W]e may affirm the judgment of the district court on any ground that finds support in the record." Higdon v. Jackson, 393 F.3d 1211, 1218 (11th Cir. 2004) (citation omitted).

would be forced to engage in criminal conduct; (3) the defendant had no reasonable legal alternative to violating the law; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. United States v. Deleveaux, 205 F.3d 1292, 1297 (11th Cir. 2000). We have previously discussed these elements of the duress defense as follows:

> The requirement of immediacy of the threat is a rigorous one; [sic] and it is clear that fear of <u>future</u> bodily harm to one's self or to others will not suffice. In order that the danger may be viewed as imminent and impending, it is ordinarily necessary to show that the coercing party was present. Moreover, the apprehension of immediate danger must continue during the whole time the crime is committed. Finally, if the accused had a reasonable opportunity to avoid committing the illegal act without subjecting himself to the threatened harm, or subsequently ignored a reasonable opportunity to escape the source of the compulsion, the defense of duress is no longer available.

United States v. Sixty Acres in Etowah County, 930 F.2d 857, 861 (11th Cir. 1991) (citation omitted).

The Supreme Court has held that under any definition of duress, "if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defense[] will fail." United States v. Bailey, 444 U.S. 394, 410, 100 S. Ct. 624, 635 (1980).

In this case, the evidence does not support a finding that Louis acted under an immediate threat of death or serious bodily injury from armed gangs known as the Chimeres in Haiti at the time she presented the forged documentation to the

13

Customs officer in the United States. Also, the evidence did not show that it would have been unreasonable for Louis to attempt to get a visa prior to coming to the United States or to apply for asylum once she reached the United States, and thus, she had reasonable legal alternatives to violating the law. Therefore, a duress instruction was not warranted.

## III. CONCLUSION

After a thorough review of the record on appeal and the parties's briefs, we discern no reversible error in Louis's trial. Thus, we affirm Louis's convictions.

**AFFIRMED**